RACHEL M. MAYER vs. BENJAMIN MORDECAI AND OTHERS.

By deed made in May, 1860, three bonds, secured by mortgages of real estate, were assigned to B., in trust, to invest the proceeds, as soon as received, "in such manner as the said B. may think proper, on consultation with " the *cestuis que trust*, and then to permit them to receive the income. The *cestuis que trust* removed, shortly afterwards, from South Carolina, where the trust was created, to New York, and remained there during the war with the Confederate States. In 1862 and 1863, B. collected the bonds in Confederate Treasury notes, then much depreciated, and invested the proceeds in bonds of the Confederate States, without consultation with the *cestuis que trust*, with whom it was, at that time, impracticable to communicate: *Held*, That B. committed a breach of trust in receiving payment of the bonds in Confederate Treasury notes, and investing the proceeds in bonds of the Confederate States, and that he was liable to account to the *cestuis que trust* for the sums received.

*Held, further*, That the obligors in the bonds were not liable to account to the *cestuis que trust*, for that they were discharged by their payments to B.

BEFORE CARROLL, CH., AT CHARLESTON, MARCH, 1868.

Under proceedings in the Court of Equity for Charleston District, one of the Masters, by deed, dated 29th May, 1860, assigned to the defendant, Benjamin Mordecai, five bonds, secured by mortgages of real estate, amounting, in the aggregate, to $8,000, and upwards, and about $4,000 in cash, to be held by him "in trust, to invest the cash aforesaid, and the proceeds of the bonds aforesaid, as soon as received, in such manner as the said Benjamin Mordecai may think proper, on consultation with the said Maurice Mayer and Rachel M., his wife, and the same being so invested, then in trust to permit the said Maurice Mayer and Rachel M., his wife, to receive the interest and income of the said settled property" for their use "during their joint lives," with limitations over.

Thomas J. Kerr, Moses Goldsmith and Alonzo J. White, respectively, were the parties obliged, in three of the five bonds, and these three bonds, amounting, in the aggregate, to about $5,000, were paid to Mordecai, in the years 1862 and 1863, in Confederate Treasury notes; and he invested the proceeds in bonds of the Confederate States of America. Kerr, Goldsmith and White were made parties defendant to the bill, and its object was to compel Mordecai to account to the plaintiff, Rachel M. Mayer, wife of Maurice Mayer, deceased, for the amount of the three bonds paid to him as aforesaid; and, also, to obtain a decree setting up the bonds and mortgages given by Kerr, Goldsmith and White as valid and subsisting securities in favor of the plaintiff.

The other facts of the case are stated in the Circuit decree and the judgment of this Court; the Circuit decree being as follows:

CARROLL, Ch.  In February, 1860, the defendant, Benjamin Mordecai, became the trustee of the plaintiff, Rachel M. Mayer, by appointment of this Court. The entire trust estate that passed into his hands consisted of a sum in ready money, and certain bonds well secured by real estate in the city of Charleston. Under the order settling that property upon Mrs. Mayer, James Tupper, one of the Masters of this Court, on the 29th day of May, 1860, executed a deed conveying the same to the defendant, Mordecai, and declaring the trusts and limitations upon which it should be held.

In the course of the year 1860, Mayer and wife removed their residence to the city of New York, and there remained until the close of the recent war between the United States and the late Confederate States of America. After June, 1861, and while the war continued, all communication between the belligerent sections was cut off. During this period the defendant, Mordecai collected three of the bonds held by him as trustee, amounting, in the aggregate, to more than $5,000, and accepted payment in Confederate Treasury notes. The great bulk of the moneys so collected he received during the year 1863, and $1,940.58 of that amount as late as the 10th of November of that year. The proceeds of the bonds so received by him he invested in the public securities of the late Confederate States, $3,600 on the 23d July, 1863, in their 7-30 per cent. Treasury notes, and $2,000 on the 10th November, 1863, in their 8 per cent. Treasury bonds.

According to the plain and unambiguous import of the trust deed, the bonds referred to were not to be treated by the trustee as permanent investments. The primary trust declared is, that he shall invest "the cash aforesaid, and the proceeds of the bonds aforesaid, as soon as received." Such proceeds—the interest as well as the principal—were to form parcel of the *corpus* or capital of the trust fund. If the attention is confined solely to the provisions of the deed, the trustee, in collecting the bonds, was acting within the strictest line of his duty. But it is objected that he could rightfully call in the money only for the purpose of investing it, and that the investment directed was impracticable, for any consultation with Mayer and wife had then become impossible. The investment contemplated was to be made in "such manner as he, the said Benjamin Mordecai, may think proper, on consultation

with the said Maurice Mayer, and Rachel Mayer, his wife." It was provided that Mrs. Mayer and her husband should be consulted by the trustee before making the investments directed, in the confidence, doubtless, that he would pay due regard to their wishes and suggestions in the matter. But no more than this seems to have been designed. The final decision, respecting the investments, is to be made, not by them, but by him, "as he may think proper."

It was, undoubtedly, for her benefit, primarily and principally, that the settlement had been ordered. Contingent interests, it is true, are given to the issue, and the husband, in the event of his surviving her. But such provisions are incidental merely to the wife's equity to a settlement, when recognized and asserted in this Court. By the terms of the trust, no beneficial enjoyment could accrue to Mrs. Mayer, or her husband, in respect of the bonds referred to, until the investment, as directed, of the proceeds. The trustee, Mordecai, under such circumstances, might well have deemed it his duty not to be dilatory in collecting those securities, and investing the proceeds so that the income contemplated might be produced with all convenient dispatch for her use and benefit. If, through unforeseen events, the investment of those funds could not be effected in the mode prescribed, yet, if the trustee conformed to it as far as was practicable, he can scarcely be held to have failed in his duty.

If the investment by the trustee, Mordecai, in Confederate securities, cannot be sustained as coming within the description of the investments mentioned in the trust deed, they may yet be held justified upon another ground. It was no breach of trust, looking merely to the trust deed, for Mordecai to receive payment of the bonds referred to. If, in good faith, he collected them for the purpose of letting the proceeds to interest at a higher rate, and upon what he deemed higher security, he was in no fault, though such disposition of the money may not have conformed to the permanent investment contemplated by the trust deed. Having a trust fund in his charge, which he could not dispose of as directed by that instrument, he was, for the time, substantially in the condition of a trustee with funds as to the investment of which the deed creating the trust gives no directions at all. But, in such case, it is the trustee's duty to invest the fund. He is bound to make it productive to the beneficiaries, and, if he fail to do so, he becomes personally responsible.—Hill's Trusts, 375. "When the trust money cannot be applied, either immediately or by a short day, to

the purposes of the trust, it is the duty of the trustee to make the fund productive to the *cestui que trust* by the investment of it in some proper security."—Lewin on Trusts, 337. The investments in question, being readily convertible into money, may, therefore, be sustained as investments temporary and provisional, operating merely to render the fund productive until it should become practicable to transfer it into the more fixed and permanent investment provided for by the trust deed.

But the plaintiff further contends that, though the trustee, Mordecai, may have had the abstract right to collect the bonds in question, and to invest their proceeds, yet that his acts, in receiving payment in the treasury notes, and in making investments in the public securities of the late Confederate States, were utterly inconsistent with ordinary prudence and circumspection. It is in proof that, in 1862 and 1863, Confederate treasury notes were the sole currency of the country, and, though depreciated, were then "commonly received," and " commonly taken in payment;" that "gold and silver were not used in the payment of debts, and were sold as merchandise ;" and that " many persons received payment of bonds held by them in Confederate money, and invested in Confederate bonds." In 1863, we are informed by the testimony that "investments were daily and freely made in Confederate securites;" that "some of the best judges sold real estate, and invested in them;" that Confederate bonds varied in their market value, and "sometimes advanced to a premium of from 43 to 45 per cent.;" and that, in November, 1863, " Confederate securities were highly esteemed—Confederate bonds then at a premium."

It should also be borne in mind that, in 1862 and 1863, the doors of the Court were practically closed against the creditor, and there were no means of enforcing the payment of either principal or interest. The trustee, Mordecai, might well have supposed that, in converting private bonds into public securities of the Confederate States, he was consulting the best interests of the parties beneficially interested. By such investment he secured, at least, prompt payment, and a higher rate of interest. Unbounded confidence then prevailed among the people of the Confederate States that they would be successful in their struggle, and, in view of their immense resources, that their public securities would prove to be advantageous and eligible investments.

As far as the safeness of the investments in question is concerned, no blame whatever can attach to the trustee. While the Govern-

ment of the Confederate States subsisted, it was a part of the Government of South Carolina, and, under *her* law, imprudence and misconduct cannot be imputed to a trustee for having confidence in the public securities of *her* government. The precise question is considered and adjudged in *Haile* vs. *Shannon*, Mss. Decis., 1866; and no case can be produced where a trustee is held chargeable for having converted private bonds into Government securities.

Wilful dereliction of duty is not imputed to the trustee, Mordecai. He seems to have dealt with the trust estate as he did with his own proper estate. Of his good faith, in respect of his investments as trustee, he has exhibited convincing proof, by his large investments, upon his own account, in the same public securities.

It does not satisfactorily appear that he has been wanting in faithful endeavors to perform the trust committed to him, and it is considered that he has incurred no personal liability, either by the collection of the bonds referred to, or by the investment of their proceeds in the public securities of the late Confederate States of America.—*Hext* vs. *Porcher*, 1 Strob. Eq., 170.

The result is, that the bill must be dismissed, as against the defendants, Kerr, White and Goldsmith. It is but just, however, that the costs should be paid by the defendant, Mordecai. The erroneous, and (until explained) suspicious statement of his accounts first rendered, well justified the plaintiff in instituting this suit.

It is ordered and adjudged, that the bill stand dismissed as to the defendants, Kerr, White and Goldsmith; that their costs of suit be paid by the defendant, Rachel M. Mayer; and, when she shall have paid the same, that they be repaid to her, with her own proper costs, by the defendant, Mordecai.

And it is further ordered, if desired by the plaintiff, that an account be taken of the funds and estate received by the defendant, Benjamin Mordecai, as trustee as aforesaid, and of his administration of the same, conformably to the principles of this decree.

The plaintiff appealed, and now moved this Court to reverse the decree, on the grounds:

1. That the defendant, Mordecai, was not required, by the terms of the trust deed, to *call in* existing securities at all, or authorized to receive payment thereof, *except* for the purpose of a more advantageous investment.

2. That the terms of the trust deed required that any new investment should be made "*upon consultation*" with Mayer and

wife, and, such consultation being impracticable, it was in violation of his duties, as trustee, to receive payment of, *and*, still more, to *call in* existing securities.

3. That the existing securities, being bonds secured by *mortgage of real estate*, worth, at the time, in the currency received by the trustee, four or five times the amount called in, the trustee, even with full discretion, was not authorized to *call in* such securities, unless some investment, in all respects more favorable, was presented. But the deed requiring "consultation," and this being impracticable, *a fortiori*, the change of securities was made at his own risk.

4. Because it was proved that at the time the bonds were called in, and payment received, they were worth more in the market than the money received in payment or the Confederate bonds in which said money was afterwards invested; and, if the securities were to be changed, the trustee should have sold the existing securities and invested the proceeds; and such disregard of the interest of the *cestuis que trust* was a breach of trust on the part of the trustee.

5. That it was a violation of trust voluntarily to *call in* securities, or to receive payment of the same, when the currency of the country was so greatly depreciated, and the more so, *when the cestuis que trust were not within reach, and could derive no advantage from* "*prompt payment.*"

6. That the trustee had no right, without consent of the *cestuis que trust,* who did not reside in the Confederate States, to *receive* for them, *as money,* Confederate Treasury notes, which, even in the Confederate States, were not a legal tender in payment of debts, were greatly below the gold standard in Charleston, and, in New York, where the *cestuis que trust* resided, were of no value whatever.

7. That the investment of the funds of the *cestuis que trust,* residing in New York, in the public securities of a Government not acknowledged by the Government under which the *cestuis que trust* resided, unacknowledged by any other power, and, at the time, sore pressed by a powerful adversary, and the whole country devastated by war, was *crassa negligentia,* and the trustee acted at his peril.

8. That the securities in which the trustee invested were illegal and unconstitutional.

9. That the issue of Confederate notes was illegal and unconsti-

tutional, and payment in said notes was no payment, and, therefore, the original mortgages are still of force.

10. That the decree of the Chancellor is in disregard of all the above positions, and otherwise contrary to the evidence and equities of the case.

*Hayne,* for appellant.

1. As to first ground of appeal, appellant refers to the provisions of the trust deed. In that deed there is no *direction to collect,* but simply a trust to *invest,* "as soon as received, *upon consultation,*" &c. The original bonds under this deed (it is submitted) were held by the trustee under the *same trusts* with subsequent investments. The investment of the "*cash*" actually made, "upon consultation," was in a bond precisely similar to the bonds called in, to wit: a bond to Tupper, Master in Equity, for purchase of Ottolengui property, secured by mortgage of real estate, one-third of the purchase money having been paid. At all events, if the interest of the bonds called in could not be paid, while in the original shape, to the *cestuis que trust,* (which is denied,) this could work no detriment to them during the time when all communication between trustee and *cestuis que trust* was cut off by the war.

2, 3. As to second and third grounds, appellant refers to the following authorities : " The trustee must be particularly careful to execute the trusts *faithfully, and according to their terms;* * * and, if any doubt or difficulty arise, it is advisable that the trustees should fulfill their trusts under the superintendence and protection of a Court of Equity."—Willis on Trustees, 124, (10 Law Library.) " Trustees have no power in themselves to change the securities on which the trust funds may be invested, unless express llowed to do so by the trust."—Ibid, 148. "The exercise ( power to vary the existing securities must, necessarily, be left v ry much to the discretion of the trustees; but the Court will not suffer this discretion to be mischievously or ruinously exercised. Where any *check* is imposed upon the trustees, by requiring the previous consent of the tenant for life, or his consent in writing, or the *observance of any other formality,* the power will be improperly exercised, unless the required condition is *strictly* performed."—Hill on Trustees, 482; *Cocker* vs. *Quaile,* 1 R. and M., 535; *Greenwood* vs. *Wakeford,* 1 Beav., 579 ; *Kelliway* vs. *Johnson,* 5 Beav., 319. "So are they (trustees) answerable to make good any loss that may arise by placing it (trust money) on improper securities, *or altering,*

*without full authority, the security on which the trust property has been previously invested.*"—Ibid, 181. See, also, Adams' Eq., 59; Story's Eq., § 1276, note 1; § 1269, note 2; § 1272; 2 Spence's Eq., 934; 1 Ves., Jr., 297; 2 Cox, 276. "Money outstanding upon good mortgage security, an executor is not called upon to realize until it is wanted in the course of administration, ' for what,' said Lord Thurlow, ' is the executor to do?' Must the money lie dead in his hands, or must he put it out on fresh securities: *On the original securities he had the testator's confidence for his sanction, but on any new securities it will be at his own peril.*"—Lewin on Trusts, 315. See Ibid, 298.

The Court will not *permit* a mortgage to be called in without inquiry.—*How* vs. *Earle Dartmouth*, 7 Ves., 150; Hill on Trustees, 382, 483. "Prompt payment" could not in any way promote the interests of the absent *cestui que trust;* and the fact noticed by the Chancellor, that the "Courts in South Carolina were closed to suitors," did not, in their situation, operate to their disadvantage. It was an additional reason for allowing the original investments to remain as they were.

4. As to fourth ground, see Hill on Trustees, or any other work on the same subject, *passim.*

5, 6 and 7. As to the fifth ground, the same, as, likewise, the sixth and seventh grounds.

8 and 9. The eighth and ninth grounds, appellant's counsel decline to argue before this Court, they having been already decided adversely by the Court of Appeals of South Carolina. They are submitted, however, for the adjudication of the Court in this case, should the Court be against the appellant on the other points made, with a view to secure to appellant a right to the judgment of the Supreme Court of the United States.

*Porter*, for Mordecai, appellee.

1. The liability of a trustee is not measured by the abstract rule of his duty; the test is, is there, or is there not, evidence of an honest and faithful endeavor to perform it?—*Hext* vs. *Porcher*, 1 Strob. Eq., 170.

If the trustee act faithfully, and with common diligence, he will not be liable if funds be lost.—*Boggs* vs. *Adger*, 4 Rich., 408.

The measure of the liability of a trustee *in this State* is good faith, and the same diligence that a prudent man applies to his own

affairs. Under this rule the trustee is entitled to be discharged, for there is not the slightest proof of bad faith, and he certainly did as well, if not better, for the *cestuis que trust* than for himself.

Then try him by the deed.

2. The deed is artificially drawn, and must be governed by the ordinary rules of construction. The matter of investment does not depend upon a *power*, but upon a *trust*. The very first *trust* is to invest cash, as well as proceeds of bonds. Distinction between *powers* and trusts—one *discretionary*, the other *imperative* and *obligatory* on conscience.—Hill on Trustees, 370–80 ; Lewin on Trustees, 22 ; *Withers & Yeadon*, 1 Rich. Eq., 327 ; 2 Sugden on Powers, 393.

Under this deed no income was to be received by *cestuis que trust*, until *investment so made*. To invest carries with it the power to collect. There could be no investment, until proceeds were received or collected. "There is a clear distinction between cases where there is an express trust for the conversion of existing securities, and cases where there is no actual direction for the conversion."—Hill on Trusts, 380. It is like the cases where there is to be a conversion of money into land, *upon request*, or *with consent and approbation*. If the manifest object is the conversion, it may be done *without request* or *consent*.—Lewin on Trusts, 807 ; *Thornton* vs. *Hawley*, 10 Ves., Jr., 129. The power to invest includes the power to give discharges to the borrowers of the money, upon calling it in.—Hill on Trusts, 383 ; *Wood* vs. *Harmon*, 5 Madd., 368. Test the powers of conversion under this deed, by supposing that the bond was a personal bond, without security, could not the trustee have made the change without consultation ?

But it is said that there was no power to receive Confederate money, which was illegal, and not a legal tender, in payment of the bonds. To this there are several answers :

1. The trust is to invest; the object is conversion ; and, if the conversion is made, and the investment accomplished, it is immaterial how or by what process this is accomplished. Suppose that, for the bonds, he had accepted Confederate Government bonds, without the intervention of currency, the objection would have no application. Government securities are the safest investment, and are never at peril.—Lewin, 343 ; Hill, 381.

2. If the power or duty to invest includes and carries with it the power to collect, then the trustee is authorized to collect in the best or only possible medium of payment. A trustee may receive pay-

ment in bank bills, if they be a part of the currency of the country. "Bank notes are part of the currency, and a good tender, unless specially objected to."—*United States Bank* vs. *Bank of Georgia*, 10 Wheat., 333.

3. The Confederate Government was a part of the Government of South Carolina, and the State of South Carolina, in all her departments, recognized and dealt with the currency of the Confederate Government as money; and this justified a trustee in accepting, as a medium of payment, the only currency that was in existence here. It is a question of good faith and common diligence, and is to be governed by the law of South Carolina.—*Pearce* vs. *Venning*, 14 Rich., 86; *Ex parte* Ward, guardian of Mrs. Sanders; *Hale and Shannon*, MSS., Dec., 1866.

But it is said the Government was illegal. The answer is, that it was a Government *de facto*. See Lord Ellenborough's definition of *de facto* officer: "One who has the reputation of being the officer that he assumes to be, but is not a good officer in point of law."— 6 East, 368. A *de facto* government is one that, by force of arms, temporarily maintains a territorial jurisdiction, and exercises the rights of sovereignty.—*United States* vs. *Rice*, 4 Wheat., 246. A *de facto* government gives the law where it has the power to enforce obedience; and those who live under it are entitled to protection in conforming to the existing state of things.—The case of the Port of Castine; *U. S.* vs. *Rice*, 4 Wheat., 253; Dana's Wheat., (8th ed.,) § 337 and notes; *Yrissari* vs. *Clement*, 2 Carr & Payne, 223; 12 Eng. C. L. R., 539.

Persons who leave their property in enemy's territory, act on the understanding that it will be dealt with according to the law of nations; and, according to the law of nations, the municipal and private laws, whether during belligerent occupation or after completed conquest, remain to regulate private rights and relations until they are changed.—Dana's Wheat., § 347, note 4 on Complete Conquest, and note 3 on Belligerent Occupation. The citizens must be governed by some law regulating private rights and relations, and the law is that of the *de facto* government until it is changed by legislative authority of the conqueror.—*Thorington* vs. *Smith*, (8 Wal., 1.) The practice of our State Government, in all its departments, and the decisions of its judicial tribunals, authorized and sanctioned the reception of Confederate currency in payment of debts, and the investment in Confederate securities, as proper and safe and legal.

The reception of Confederate currency was not illegal.—*Phillips* vs. *Hooker*, Amer. Law Reg., Vol. 7, No. 1, Nov., 1867; *Robinson* vs. *Insurance Co.*, Amer. Law Reg., Vol. 8, No. 3, March, 1869; and the case of *Thorington & Smith.*

War prohibits intercourse, trading and suing; but it does not dissolve the fiduciary relation. That still exists, and the trustee must maintain it in good faith. He must preserve the property in his best judgment, and according to the *laws* and the circumstances in which he is placed; and, having done this in good faith, he is entitled to a discharge.

*Buist,* for White and Goldsmith, appellees.

The eighth and ninth grounds of appeal are the only grounds which affect the defendants, Alonzo J. White and Moses Goldsmith.

It is stated, in the points and authorities annexed to the brief, that the appellants' counsel decline to argue them before the Court, they having been already decided adversely by the Court, but they are submitted (it is said) for adjudication in this case, should the Court be against the appellant on the other points made. And it is submitted, on behalf of the said defendants, Alonzo J. White and Moses Goldsmith, should the Court entertain the said grounds of appeal, that they cannot be sustained against them. The bond executed by the defendant, White, was paid in full on the 25th day of May, 1863, and delivered up and cancelled, and the mortgage to secure the same satisfied on the records of the office of the Register of Mesne Conveyance, in Charleston, where it was recorded. The bond executed by the defendant, Goldsmith, was, likewise, paid in full, on the 10th November, 1863, and cancelled, and the mortgage also satisfied. They dealt with Mordecai, trustee, whom they alone knew and recognized as the party authorized to deal with them, and they were authorized and protected by law in so doing, and were bound to know and recognize him, and no one else. The money paid by them was the currency of the country, and the only currency, and satisfaction of debts in that currency, at the periods at which these bonds were paid, was by no means unusual. If there is any liability in the premises, the trustee, Mordecai, who was acquainted with the provisions of the trust deed, under which he was acting, is the only person who can be held responsible. The defendants, White and Goldsmith, are innocent, and, in the absence of any evidence whatever of fraud or collusion,

in no point of view can any liability attach to them, or either of them.

And the following cases are referred to, in support of the positions thus assumed: *Pyron* vs. *Redheimer*, 1 Speer's Eq., 135; *Spencer* vs. *The Bank*, Bail. Eq., 468; *Laurens* vs. *Lucas*, 6 Rich. Eq., 217; *Elliott* vs. *Merrimann*, 1 Leading Cases in Equity, 76; *Smith* vs. *Brown*, 5 Rich. Eq., 291.

March 28, 1870. The opinion of the Court was delivered by

MOSES, C. J. When a trustee is not limited or directed by the instrument under which he acts, and is left to the discretion of his own judgment, our cases hold that his discretion must be exercised with the same diligence and care that a prudent man would bestow on his own concerns.

It is not to be understood by this that, wherever loss ensues from the investment of the trustee, he will be excused by showing that persons of care and prudence, in the management of their own affairs, made investments of the same character and were disappointed in the result. A prudent man, dealing with his own means, might employ them in speculations promising large gains, or loan them on personal security, or invest in the stocks of railroad companies or other private corporations. If a trustee should, however, so loan, or engage in such enterprises, at the expense of the interests committed to his charge, he could not claim excuse by pointing to the course of individuals, noted for their prudence, by whose example he had been misled.

The principle which is to be extracted from the cases in this State consists with what is said in Hovenden on Frauds, 486: "He is bound to manage the property for the benefit of the *cestui que trust* with the care and diligence of a prudent man." What will constitute the care and diligence thus exacted will depend on the attendant circumstances. If the act, in itself, was an incautious and imprudent one, it will not be sustained; and no aid derived from the fact that the trustee was countenanced in it by the participation of prudent men will give it sanction or support.

In the case under review, the bonds and the cash constituted the whole trust estate. The cash was invested in a bond of the character of those transferred to the trustee, and was secured by a mortgage of real estate. This was done on consultation with the plaintiffs, and the trustee had therefrom some indication of the investment they preferred. It was, at least, notice to him that the other

bonds were in a form of security satisfactory to the parties interested.

He maintains that he was bound to collect, because the proceeds of the bonds, when received, were to be invested; but how were they to be invested? "In such manner as the said Benjamin Mordecai may think proper, on consultation with the said Maurice Mayer, and Rachel M., his wife." The power to collect was not at all dependent on the duty to invest. The bonds, by the deed, were transferred and assigned to him. The legal title was in him, and this, of itself, conferred the power to collect. If the deed had not directed an investment, still it would have been his duty, on the receipt of payment of the bonds, to have disposed of their proceeds in some proper manner, for the benefit of those interested in the trust. An omission to do so would have made him chargeable with interest on the funds retained in his hands, and subjected him to the animadversion of the Court by which he was appointed, for holding, in place of investing them.

It is not in consistency with his position thus taken to say, that the duty to collect was so compulsory that it could not be deferred, because a necessity to invest was imposed upon him. The investment was to be "on consultation" with the plaintiffs. Of their absence, and the impracticability of reaching them, he was aware, and his own action in calling in the securities, which he says was demanded by the deed, was in disregard of a reservation or qualification, which must have been made expressly for their benefit. Although it may be possible that, after consultation, he had the power to reject their suggestions, and disappoint their wishes, by pursuing a course which might be objectionable, and even obnoxious to them, still the condition conferred a privilege, and they should have had the opportunity of communicating their impressions as to the investment which, in their judgment, would best conduce to their interest.

So far as any conversion was to be effected, it was to be done on consultation with the *cestuis que trust*. The result might have satisfied the trustee of the improvidence of the particular investment to which he was inclined. A conference with them might have aided his judgment. At any rate, he was to invest, after having the benefit which a consultation with them might possibly afford. His authority should have been strictly exercised.

While the trustee relies on their absence as an excuse, on the one hand, for not consulting them, on the other, he avers that an early

conversion was for their benefit, as they were not entitled to the interest on the bonds until they were called in and the proceeds invested. If they could not, as they did not, after the collection of the bonds, receive the interest, in consequence of the want of intercourse between the citizens of the Confederate States and the United States, how were they benefitted in that regard by the change? It would have contributed more to their advantage to allow the interest to accumulate on the bonds than to place them in securities, which, if they produced interest to which the plaintiffs were entitled as income, could be of no avail to them for present use and support, and would, therefore, remain in the hands of the trustee, yielding no profit to them.

It is not clear that the plaintiffs were not entitled to the annual interest on the bonds, and that their enjoyment of it was to be postponed until they were converted, through collection, into some other investment. The deed looked to their reception of the interest on the "settled property," and the bonds constituted that property. A decision of that question is not now necessary, but it will not be out of place to refer to the order which prescribed and fixed the terms of the settlement. It directs "that the share of the plaintiff, Rachel M. Mayer, be conveyed by deed to Gustavus Poynanski," (in whose place the said Benjamin Mordecai was substituted,) "upon the trusts and conditions set forth in the answer to complainant's bill." The answer furnishes the fact, "that the income of the property, so settled, was to be for the joint use of her husband and herself, during their joint lives," &c. If there was a reason for such a change by the Master who executed the deed, it has not been made to appear in the course of the case. It is, at least, certain that the trust contemplated by the plaintiffs was to make them the recipients of the interest accruing annually from the share of the wife in the real estate of her father, which share was represented by the bonds and cash to be transferred by way of settlement.

The motive which induced the trustee to collect the bonds was not, in fact, to provide an investment which would furnish the plaintiffs with the annual income arising from it, as was submitted in the argument. His conception was, that they were entitled to the interest on the bonds, and on that he acted, for the exhibit filed with his answer shows that, to July 5, 1861, at which period communication with the plaintiffs became almost impossible, he did transmit to them the interest received on the bonds.

The collection of White's bond stands on a different footing from that of Kerr's and Goldsmith's. Payment of it was tendered to him in Confederate Treasury notes, and we are to consider whether the acceptance of it, in such currency, under the circumstances, is consistent with the faithful discharge of the duty which he owed to those whose interests were confided to him, in a fiduciary capacity, at a time when they were entirely incapable of contributing, by their presence or their counsel, to the protection of them. The bond was secured by a mortgage of real estate. According to the testimony, in May, 1862, when the first payment in Confederate currency was accepted, such property was worth, in that currency, about fifty per cent. more than it would have brought in gold before the war; and, in May, 1863, when the second payment was made, it was worth three times as much. It was in evidence that "no prudent person would have sold property in 1863 for the same amount, in dollars and cents, that he would have sold it for before the war, and receive payment in Confederate money, or bonds representing on their face that amount." With knowledge of all this, he accepted, in a currency which was not a legal tender, even under the Constitution or laws of the Confederate States, payment of the bond at the amount due on its face. To say nothing of the want of all obligation to receive such currency, can his act be recognized as one of ordinary prudence? The bond and mortgage, as a marketable article, were worth much more than he received. If he had sold them, they would have yielded a higher amount, and his fund for investment in the securities in which he appeared to have so much faith, although issued by a Government waging war against that in the territory of which his *cestuis que trust* were domiciled, would have been still larger. Regarded, even, as a mere business operation, it exhibits, to no small extent, the characteristics of neglect and indifference to his trust.

The fact that the city was besieged, and the buildings subject to the chances of injury by the explosion of shells, affords no excuse. If parties were disposing of their real estate, and retreating to the interior, fearful of the fall of Charleston, the loss to the Confederacy of one of its principal supports, that had so long resisted an attack, would not have contributed to enhance the securities into which he converted the mortgage; and, even if the buildings had been destroyed, there would have remained some value in the land.

What has been said in regard to the bond of White, applies, with still more force, to those of Kerr and Goldsmith. The trustee,

under the circumstances already referred to, invited or called them in, without any offer of payment from the obligors. It is said, in the decree, "that, having a trust fund in charge which he could not dispose of, as directed by the deed, he was, for the time, substantially in the condition of a trustee with funds as to the investment of which the instrument creating the trust gives no directions at all."

Is it in his power to seek relief from such inability, when it arose, in a great measure, from his own voluntary act?

That he sold, during the war, his own residence, in Charleston, and invested largely in Confederate bonds, while it exhibits his great faith in the ultimate establishment of the Government whose currency he so much favored, may be accepted as the evidence of a patriotism so controlling as to absorb every selfish and interested motive. He could do as he pleased with his own, but he had not the right to risk, to the chances of the whirlpool, the means of others, entrusted to his care and protection.

Although the trustee is not discharged from liability to account for the three bonds, yet the mortgage, as against the original debtors, cannot be set up as of force. The legal title to the bonds was in him, and with the investment of the proceeds they had no concern. If, according to the ruling in this State, a vendee is not bound to see to the application of the purchase money, (*Lining* vs. *Peyton,* 2 DeS., 375 ; *Laurens* vs. *Lucas,* 1 Rich. Eq., 226,) or a mortgagee under the order of the Court, that the money is appropriated to the purpose for which the mortgage was taken, (*Spencer* vs. *Bank of State,* Bail. Eq., 468,) much less can a debtor who makes satisfaction to the creditor, in a manner acceptable and agreed to by him, in the form of actual payment, be held to such requisition.

Mr. Justice Inglis, in *Austin* vs. *Kinsman,* 13 Rich. Eq., 265, says, "a creditor, though entitled to demand payment in lawful money, may waive his right and accept any substitute he pleases, and his voluntary acceptance of such substitute, as payment, makes it so."

If the satisfaction of the bonds was the result of a fraud between the debtors and the trustee, or induced by an improper combination, to the prejudice of the *cestuis que trust,* or if the debtor knew of the intended misapplication of the proceeds by the trustee, and in any way wrongfully facilitated the accomplishment of that design, the instruments would be set up as existing and binding. But

no such proof has been made in the case. On the contrary, as to the two principal bonds, the trustee required the payment. There was no medium of circulation but Confederate currency. This the trustee might have rejected ; but, so far from doing so, he sought payment in it. There is no testimony showing any willful combination on the part of White, Kerr, or Goldsmith, with the trustee, that would justify an interference to hold them responsible for the act for which alone he should respond.

It is ordered and adjudged, that so much of the decree as dismisses the bill, as to the said White, Kerr and Goldsmith, and directs the payment of the costs, be confirmed.

That the decree of the Chancellor, as to the said Benjamin Mordecai, be set aside, and the case remanded to the Circuit Court, with instructions for an order directing him to account, as trustee under the said deed, on the principles hereinbefore set forth, and for all proper orders necessary and requisite to carry out the judgment of this Court in the premises.

*Willard,* A. J., concurred.